[Cite as *State v. Ewing*, 2017-Ohio-7194.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellant | : | C.A. CASE NO. 27456 |
| | : | |
| v. | : | T.C. NO. 16-CR-2886 |
| | : | |
| DON L. EWING | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____11th____ day of _____August_____, 2017.

. . . . . . . . . .

MICHAEL J. SCARPELLI, Atty. Reg. No. 0093662, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellant

ADELINA E. HAMILTON, Atty. Reg. No. 0078595, Assistant Public Defender, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
        Attorney for Defendant-Appellee

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of the State of Ohio. The State appeals from the trial court's February 7, 2017 Decision and Entry granting Don Lynn Ewing's motion to suppress. We hereby affirm the judgment of the trial court.

{¶ 2} On September 14, 2016, Ewing was charged by way of Complaint in Dayton Municipal Court with one count of resisting arrest, in violation of R.C. 2921.33(A), a

misdemeanor of the second degree. In a second Complaint on the same date, Ewing was charged with one count of carrying a concealed weapon, in violation of R.C. 2923.12(A)(2), a felony of the fourth degree, and in a third Complaint on the same date, Ewing was charged with one count of having weapons while under disability (prior offense of violence), in violation of R.C. 2923.13(A)(2), a felony of the third degree.

{¶ 3} On October 19, 2016, Ewing was indicted, in the Montgomery County Court of Common Pleas, on one count of carrying a concealed weapon; one count of having weapons while under disability (prior offense of violence, namely aggravated burglary and 2 counts of felonious assault in Case No. 1998 CR 2931 in the Montgomery County Court of Common Pleas); one count of resisting arrest; one count of possession of heroin (less than one gram), in violation of R.C. 2925.11(A), a felony of the fifth degree; and one count of possession of cocaine (less than five grams), in violation of R.C. 2925.11(A), a felony of the fifth degree.

{¶ 4} On November 3, 2016, Ewing entered pleas of not guilty, and on November 18, 2016, he filed his motion to suppress. At the January 23, 2017 hearing on the motion to suppress, Jeremy Reeb testified that he is a police officer employed by the City of Dayton Police Department, having been so employed for two-and-a-half years. He stated that he has a total of seven years of law enforcement experience. Reeb stated that on September 13, 2016, he and Officer Michael Conrads were on bike patrol in the East Third Street corridor in Dayton. Reeb stated that he and Conrads observed Ewing on East Third Street, close to 28 More Avenue, at around 10:00 p.m., and that it was dark outside. Reeb testified that he is a member of the "community problem response team where we receive all the east side drug complaints throughout the neighborhood," and

that he and Conrads were "watching a specific house on More Avenue, located at 28," on a complaint of drug activity. Reeb stated that he is involved in drug cases every day. He testified that he observed Ewing cross the street and enter 28 More Avenue, and then depart after being inside for approximately five minutes. He stated that the short time that Ewing remained in the home caught his attention. Reeb testified that when Ewing left the residence he "began walking south towards East 3rd Street for a couple feet and then he'd walk diagonally across More Avenue, in the lane of travel for motor vehicles and then continued back towards 3rd Street." According to Reeb, Ewing was in the street walking diagonally for 25 to 30 feet.

{¶ 5} Reeb stated that he and Conrads approached Ewing on their bicycles, and that Ewing "made a right hand turn to travel west on 3rd Street," and that they caught up with him there. Reeb stated that they intended "to make a stop on him for jaywalking across More Avenue." Reeb testified that he "was able to get directly behind [Ewing] before he even recognized us. I asked him to stop. I got off my bicycle and I told him the reason I stopped him was for jaywalking and then from that point I then asked him for identification. Then I told him prior to getting your wallet out * * * do you mind if I pat you down for weapons?" Reeb further testified, "I said, prior to you getting your wallet out, I said, I'm going to pat you down for weapons, so please don't reach for anything." When asked why he wanted to pat Ewing down, Reeb responded, "This is the highest drug and prostitution area on the east side of Dayton," and "with drugs, we tend to find weapons."

{¶ 6} Reeb stated that "when I expressed my concerns for patting him down for weapons, he immediately took a step away from me, which made me nervous. I don't know why he was trying to make separation between the two of us." At that time, Reeb

stated that he "took another step towards [Ewing] and asked him again if he had any weapons on him." Reeb testified that Ewing then took another step away from him and then "he tried to turn away from me and * * * lunge like he was about to run across the street." Reeb stated that he "was then able to gain control of him. I grabbed ahold of him and took him to the ground and then Mr. Ewing was kind of refusing to put his hands behind his back." Reeb stated that he and Conrads "had to gain control of his arms and put them behind his back to place him in cuffs."

{¶ 7} On cross-examination, Reeb indicated that More Avenue connects Second and Third Streets. After viewing State's Exhibit A, an aerial view of the area around 28 More Avenue, Reeb acknowledged that there is no marked crosswalk and no traffic light at More Avenue and Second Street or More Avenue and Third Street. Reeb stated that he is familiar with Section 75.02 of the Dayton Revised Code of General Ordinances ("RCGO"), entitled "Use of walk by pedestrians." Section (A), which Reeb read aloud from Defense Exhibit C, provides: "Where usable walks or paths parallel a street or highway, pedestrians shall not travel in, along, or on the vehicular traveled portion of such street or highway, except to cross the roadway in the manner provided by law." Reeb testified that Ewing "had access to both sidewalks on both east and west sides of the roadway. He decided to walk in the middle of the road. He didn't go to the intersection. He walked diagonally across a traveled path for motor vehicles."

{¶ 8} Reeb also read Defense Exhibit D aloud, which is RCGO Section 75.05(A), entitled "Right-of-way yielded by pedestrian," as follows: "Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles, trackless trolleys,

or streetcars upon the roadway." Reeb stated that he wanted to pat Ewing down for weapons due to "where [Ewing] was coming from." He acknowledged that Ewing did not make furtive movements as he approached him from behind, and that he did not observe any bulges about Ewing's person. Reeb acknowledged that he was in the area on a "drugs complaint," not a weapons complaint. Reeb stated that Ewing told him that he did not want him to touch him. Reeb stated Ewing did not have the opportunity to run from him after he grabbed him and took him to the ground. Reeb testified that after Ewing was on the ground, Ewing said, "yes, I have a gun in my waistband." Reeb stated that he assisted Ewing to his feet, and that he noticed a purple Crown Royal bag in the front of Ewing's pants. He testified that Ewing indicated that his gun was in the bag. Reeb stated that the jaywalking offense for which he cited Ewing is a minor misdemeanor. On redirect examination, Reeb stated that Ewing was arrested for what was found on his person.

{¶ 9} Detective Gary Engel testified that he is employed at the Dayton Police Department. He identified as State's Exhibit 1 certified copies of two minor misdemeanor citations issued to Ewing by Reeb and Conrads on September 13, 2016. Engel stated that one of the citations is for jaywalking and one is for marijuana. Engel stated that on October 12, 2016, the jaywalking charge was dropped. On cross-examination, Engel testified that Ewing was charged with violating RCGO Section 75.02(A). Engel testified that the following handwritten text appears on the citation: "Jaywalked from east curb on More Avenue to west curb sidewalks and cross walk available. No debris in roadway. Crossed diagonally in roadway."

{¶ 10} In its decision granting Ewing's motion to suppress, the court noted that the

Dayton Police Department had received a complaint about drug activity at 28 More Avenue and that there "is no evidence in the record about the number of complaints and whether they were anonymous" or from a reliable source. The court noted that Reeb found Ewing's conduct in entering 28 More Avenue and leaving within five minutes to be suspicious. The court noted that Ewing "walked south on the sidewalk near 28 More Avenue, which is on the east side of the street, and then proceeded to cross More Avenue in a diagonal fashion. * * * There was no vehicular use of the street at that time."

{¶ 11} The court found that Reeb "credibly testified that he believes the E. 3rd Street corridor to be a high crime area. He credibly testified that the area has the highest amount of drug and prostitution activity in east Dayton." The court noted that Reeb testified that "often where drugs are found guns are also present." The court noted that when Reeb encountered Ewing, Ewing "indicated verbally that he did not wish Officer Reeb to touch him. So, he took one step away from Officer Reeb. It should be noted that Officer Reeb was very close to [Ewing] when [Ewing] made one step back." The court noted that the jaywalking case against Ewing was dismissed, since the "City declined to prosecute the case in light of the more serious felony case being pursued in the Common Pleas Court."

{¶ 12} The court noted that while there were sidewalks on both sides of More Avenue, Ewing "did not fully utilize the sidewalks. Rather, for a short period of time, he walked in the vehicular portion of the street. [Ewing] did not cross simply east to west. He walked in a southwesterly direction for a time." The court concluded that Ewing violated RCGO Section 75.02(A), which prohibits jaywalking. The court found that Reeb "had a right to issue a citation for the misdemeanor which the officer himself witnessed,"

and that the stop of Ewing "was a lawful stop."

{¶ 13} The court further concluded that "there is no evidence that Reeb's pat-down of [Ewing] was based on a reasonable and articulable suspicion that [Ewing] may have been armed. Reeb explained the basis for the frisk, stating that drugs and guns go together. He testified that he had made many drug arrests."

{¶ 14} The court further noted that there "is a question by the officers in which [Ewing] makes a concession and then the Officers retrieve a bag from the Defendant." The court concluded that despite the fact that Ewing admitted to having the weapon before it was retrieved from his person, "a search occurred and the fourth amendment is applicable." Pursuant to R.C. 2935.26(A), the court determined that Ewing "should have simply been cited for the jaywalking violation. He should not have been taken to the ground. The Officer wanted to pat-down the Defendant rather than engage in the original basis for the stop. This was a jaywalking violation and the activity should have been consistent with resolving that matter."

{¶ 15} The court noted that it "may be argued that [Ewing] was going to flee. Adding the element of flight to the other circumstances it could be argued gives rise to a reasonable and articulable suspicion that [Ewing] was armed and dangerous." The court noted, however, that the "facts do not indicate that [Ewing] actually ran. [Reeb] was speculating that it was his * * * intent. What actually occurred was that upon the demand for a pat-down [Ewing] stepped back. [Reeb] stepped forward, [Ewing] stepped back and [Ewing] then appeared to turn. It was at that point that he was forcibly seized." According to the court, "it is reasonable to conclude that by [Ewing] simply backing away slowly over a short distance there is no creation of a reasonable and articulable suspicion

that [Ewing] is armed and dangerous, as required for a pat-down."

{¶ 16} The court concluded that the stop was valid "because [Ewing] engaged in jaywalking. Jaywalking is a minor misdemeanor. Pursuant to Ohio law [Ewing] should have simply been cited and not arrested. Officer Reeb decided not to immediately pursue that procedure. He decided to engage in a pat-down. He did so without reasonable and articulable suspicion that [Ewing] was armed and dangerous." The court further noted that Ewing "was not given the opportunity to identify himself." The court concluded that the case is analogous to *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300.

{¶ 17} The State asserts one assignment of error herein as follows:

THE TRIAL COURT ERRED IN GRANTING EWING'S MOTION TO SUPPRESS.

{¶ 18} The State asserts that "under the totality of the circumstances, the officers had reasonable suspicion that Ewing was involved in drug-trafficking and, accordingly, was armed and dangerous." According to the State, "even if the officers lacked reasonable suspicion to perform a weapons search, Ewing committed the offense of obstructing official business when he attempted to flee the scene, and the evidence was validly seized incident to a lawful arrest."

{¶ 19} The State asserts that the trial court correctly concluded that Reeb "had the authority to detain Ewing based on a jaywalking violation" pursuant to RCGO Section 75.02 "in order to issue a citation." The State asserts that even if Ewing was not observed jaywalking, the officers had a reasonable, articulable suspicion that Ewing may have been involved in drug activity based upon his brief presence in 28 More Avenue, an

address associated with drug activity, as well as the general area's significant drug and prostitution activity, citing *State v. Barton*, 2d Dist. Montgomery No. 21815, 2007-Ohio-2348. The State asserts that Reeb "could reasonably suspect that Ewing was involved in drug-trafficking, which would allow him to further suspect that Ewing might have been armed."

{¶ 20} According to the State, "Ewing's attempt to put distance between himself and Officer Reeb when the officer mentioned the possibility of Ewing having a weapon as well as Ewing's attempt to run away were relevant factors for Officer Reeb to consider in developing reasonable suspicion that Ewing may have been armed." The State argues that while Reeb "announced his intention to perform a pat-down, the officer did not actually lay his hands on Ewing until he turned and appeared to begin to flee. * * * Since no 'search' occurred prior to this point, Ewing's movements away from Officer Reeb at the mention of a potential weapon were valid objective facts to consider in the reasonable suspicion analysis."

{¶ 21} The State further argues that even "if the officers did not possess reasonable suspicion that Ewing was armed and dangerous, they lawfully arrested Ewing when he attempted to flee the scene, and the evidence was subsequently discovered as a legitimate search incident to that lawful arrest." The State directs our attention to *State v. Williams*, 192 N.J. 1, 926 A.2d 340 (2007), and asserts that "the New Jersey Supreme Court confronted similar legal issues as the ones presented in the case at bar," and to *State v. Lewis*, 2d Dist. Montgomery No. 27152, 2017-Ohio-1195. The State argues that "Ewing had no right to leave the scene," and that "in fleeing, Ewing committed the independent criminal offense of obstructing official business in the presence of Officers

Reeb and Conrads. * * * The officers were then authorized to arrest Ewing, which they did by physically restraining Ewing and placing him in handcuffs." According to the State, "the officers were authorized to search Ewing's person incident to arrest, which yielded the handgun and narcotics."

{¶ 22} The State asserts that "the implicit suggestion by the trial court that Officers Reeb and Conrads actually had to let Ewing run off before they could arrest him defies logic." The State argues that if "Reeb lacked the constitutionally-mandated reasonable suspicion to conduct a pat-down, Ewing could have stood his ground, and if the pat-down resulted in the discovery of incriminating evidence, Ewing's remedy was to have that evidence suppressed pursuant to a judicial decision." According to the State, "instead, he chose to commit an independent criminal act that led to his arrest." The State asserts that since "Ewing was searched incident to a lawful arrest, and his conduct leading to the arrest removed any unconstitutional taint, the trial court erred in suppressing the evidence." Finally, the State asserts that Ewing "admitted that he had a handgun. * * *Assuming *Miranda* warnings were required and not given, the evidence recovered would not be subject to suppression," pursuant to the inevitable discovery doctrine.

{¶ 23} In response, Ewing initially argues that the officers improperly stopped him for jaywalking. Ewing asserts that RCGO Section 75.05(A) does not prohibit crossing in the middle of the road unless the pedestrian fails to yield the right of way to vehicles on the roadway. Ewing asserts that Reeb did not testify regarding the traffic conditions on More Avenue on September 13, 2016, when Ewing crossed the street, "so it is not in the record whether there were any vehicles traveling on the roadway of More Avenue when Ewing crossed." According to Ewing, without "any testimony that Ewing failed to yield

the right of way of traffic, the State failed to meet its burden that a jaywalking offense had been committed by Ewing, thus the initial stop for [j]aywalking was invalid and the officers lacked any reasonable, articulable suspicion to stop or seize Ewing for a jaywalking offense." Ewing "requests that the State's first argument that the initial stop and detention of Ewing was valid be overruled and that all evidence discovered on Ewing's person be affirmed as suppressed as 'fruits of the poisonous tree.' "

{¶ 24} Ewing directs our attention to *State v. Sumlin*, 2d Dist. Montgomery No. 23144, 2009-Ohio-2185, and he asserts that "the State's argument that the totality of the circumstances justified the pat down frisk should be overruled." Ewing asserts that he did not resist arrest, pursuant to R.C. 2921.33(A)(1), or obstruct official business, pursuant to R.C. 2921.31(A), and he argues that pursuant to either statute, "the duties of an officer must be lawful or the arrest itself must be lawful."

{¶ 25} Ewing asserts that the State "relies solely on the concept of flight to make its argument that the arrest of Ewing was justified." Ewing asserts that "the trial court found that 'the facts do not indicate that [Ewing] actually ran,' " and "absent from the transcript of the suppression hearing is the fact that Ewing actually did run." Ewing asserts that "there was no chase, no pushing of the Officer aside to get away, and no flight." He asserts that "without flight, there was no resisting arrest and no obstructing official business, and therefore, no valid arrest of Ewing."

{¶ 26} Finally, Ewing asserts that there was no testimony about arresting Ewing for resisting arrest or obstruction of official business. He asserts that "on re-direct, Officer Reeb testified specifically that the arrest of Ewing was based on items found on Ewing's person." Ewing asserts that the inevitable discovery doctrine does not apply

because "the State failed to show that the police 'were actively pursuing an alternate line of investigation, one untainted by the illegality that took place prior to the particular misconduct,' " quoting *State v. Porter*, 178 Ohio App.3d 304, 2008-Ohio 4627, 897 N.E.2d 1149 (2d Dist.). He asserts that "the State merely is attempting to argue on appeal that Officers 'could have' pursued an arrest for resisting arrest or obstructing official business when the facts from the testimony at the suppression hearing demonstrate that was not the basis for the arrest at all."

{¶ 27} In Reply, the State asserts that while Ewing asserts that his stop was invalid pursuant to RCGO Section 75.05, "the trial court relied on Section 75.02 instead, and ruled that Ewing did not make reasonable use of the sidewalks on either side of the street when he crossed More Avenue in a 'diagonal' fashion. * * * As Ewing's own exhibits demonstrated, he was cited for violating 75.02, not 75.05."

{¶ 28} The State argues that "Ewing makes no attempt in his Brief to counter the argument that he was lawfully stopped as part of a valid *Terry* stop based on reasonable suspicion of drug activity even if he did not commit a jaywalking violation." According to the State, "the officers could have based their decision to detain Ewing on the fact that he quickly entered and exited a residence associated with drug activity in a larger neighborhood known for significant drug and prostitution crime. * * * Since the officers had this independent justification for detaining Ewing, his argument that he was illegally seized lacks merit."

{¶ 29} The State asserts that the matter herein is more closely analogous to *State v. Wilks*, 2d Dist. Montgomery No. 20123, 2004-Ohio-4046. The State argues that "Ewing responded to Officer Reeb's stated intention to perform a weapons search by

stepping away from the officer twice, and on the second occasion, attempting to flee the scene," after having been observed in a house associated with drug activity.

{¶ 30} Finally, the State asserts that Ewing was lawfully searched incident to arrest, and that Reeb's "testimony indicates that he had a good-faith belief that he was authorized to pat Ewing down when he made the announcement" that he intended to do so. According to the State, it "defies common sense to require Officer Reeb to allow a suspect, whom the officer believes is about to flee, to actually run away * * *."

{¶ 31} As this Court has previously noted:

"Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Koon,* 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13 quoting *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.* The application of the law to the trial court's findings of fact is subject to a de novo standard of review. *State v. Gordon,* 5th Dist. Fairfield No. 14–CA–13, 2014-Ohio-5027, ¶ 14, citing *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

*State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.).

{¶ 32} We initially note that the conduct of the defendants in *Barton, Williams, Lewis*, and *Wilks,* upon which the State relies, is distinct from that of Ewing. In *Barton*, 2007-Ohio-2348, this Court determined that the police officer therein had "probable cause to detain Sean Barton for the minor misdemeanor jaywalking offense, and he had a reasonable articulable suspicion to detain him for the investigation of the crime of drug possession." *Id.*, ¶ 11. The police officer testified at the suppression hearing that he "believed that the jaywalking by Barton was done in order to avoid his police cruiser," and that he observed Barton toss a baggie containing a substance that was field tested and determined to be cocaine. *Id.* There was no testimony that Ewing attempted to evade the officers after exiting 28 More Avenue, and Ewing did not discard drugs in the officers' presence.

{¶ 33} At issue in *Williams*, 192 N.J. 1, was whether Marcellus Williams, "who resisted and fled from a presumed unconstitutional investigatory stop and who was later arrested for obstruction is entitled to suppression of the handgun seized incident to his lawful arrest." *Id.*, at 4. When the officers initially approached Williams to interview him, in a high crime area, on a report of someone possibly selling drugs, they asked him to place his hands on his head to pat him down for officer safety, and in response, Williams "pushed Officer McRae and fled" for approximately 100 feet, where he fell to the ground. *Id.*, at 5. The Supreme Court of New Jersey determined that "Defendant's resistance to the pat down and flight from the police in this case was an intervening act – the crime of obstruction – that completely purged the taint from the unconstitutional investigatory stop." *Id.*, at 18. There was no testimony that Ewing shoved Reeb or Conrads, or that

he was able to flee the scene.

{¶ 34} In *Lewis*, 2017-Ohio-1195, this Court determined that a valid stop of Derrick Lewis occurred for traffic violations, and that even if the officer "impermissibly attempted a pat down as part of the stop, Lewis was not entitled to respond by fleeing on foot and forcing the officer to chase him into the street," and that "by fleeing the scene of a lawful traffic stop, Lewis subjected himself to a valid arrest for obstructing official business." *Id.*, ¶ 12. This Court found that the officer "was entitled to search him incident to that arrest." *Id.*, ¶ 13. Again, Ewing did not flee from the officers, and they were not forced to chase him.

{¶ 35} In *Wilks*, 2004-Ohio-4046, a police officer, dispatched to a home pursuant to a 911 call from an unknown caller, observed a bag of marijuana next to Donald Eugene Wilks on a bench seat in his car at the location. *Id.*, ¶ 5. The officer testified that he intended to recover the marijuana and issue a citation. *Id.*, ¶ 6. The officer ordered Wilks to get out of the car and put his hands on his head to be patted down. *Id.* This Court determined that while the officer's "request to pat down Wilks was a 'show of authority' it was not a pat down until he actually conducted it," and that Wilks' response to the request, "by running away and grabbing for something at his waist provided justification for a pat down of him when he was caught." *Id.*, ¶ 16. There was no testimony that Ewing reached into his clothing in the presence of the officers.

{¶ 36} We will next consider *State v. Roberts*, 2010-Ohio-300, which the trial court analogized to the matter herein. Therein, Rashonn Roberts was observed riding a bicycle on the sidewalk and then crossing North Main Street " 'at a diagonal zigzagging out of traffic.' " *Id.*, ¶ 4. Since "cyclists are not permitted to ride their bicycles on the

sidewalk and Roberts crossed North Main Street 'in complete violation of every traffic law that we have,' " Dayton Police Officer Fuller decided to issue a citation to Roberts. *Id.* The following additional facts were established at the suppression hearing:

Fuller pulled his cruiser onto North Main Street and, using the PA system in the cruiser, instructed Roberts to pull over his bicycle. Roberts pulled over at the intersection of North Main Street and East Shadyside. At the officer's request, Roberts stepped off the bicycle, holding the bicycle upright. Fuller asked Roberts to lay down the bicycle. Roberts complied with some reluctance.

Fuller informed Roberts that he was going to frisk Roberts for weapons. Fuller explained at the hearing that he had decided to pat down Roberts because the area was a high crime and high drug area, where there had been numerous robberies and a recent officer-involved shooting. Roberts said, "okay," and faced the officer's cruiser. Fuller began by patting down the pockets of Roberts' shorts. Fuller felt an object in the right pocket that was immediately apparent to be a large handgun. The officer told Roberts to put his hands behind his back and "grabbed hold" of Roberts' arms so Roberts could not reach for the gun. Roberts "started fighting." Fuller called for assistance from other officers. Roberts was subsequently subdued by four officers. Roberts was handcuffed, a .380 semiautomatic handgun was retrieved from his pocket, and he was placed in a cruiser.

*Id.*, ¶ 5-6.

**{¶ 37}** Roberts was subsequently indicted for assault of a peace officer, having

weapons while under disability, and carrying a concealed weapon, and he filed a motion to suppress. *Id., ¶* 7-8. The trial court overruled the motion. On appeal, this Court noted as follows:

> The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Under *Terry,* police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *State v. Martin,* Montgomery App. No. 20270, 2004–Ohio–2738, at ¶ 10, citing *Terry,* supra; *State v. Molette,* Montgomery App. No. 19694, 2003–Ohio–5965, at ¶ 10. A police officer may lawfully stop a vehicle, motorized or otherwise, if he has a reasonable articulable suspicion that the operator has engaged in criminal activity, including a minor traffic violation. See *State v. Buckner,* Montgomery App. No. 21892, 2007–Ohio–4329, ¶ 8.

*Id.*, ¶ 14.

{¶ 38} This Court determined that Fuller was entitled to stop Roberts, since Fuller "observed Roberts riding his bicycle on the sidewalk, contrary to local ordinance, and saw Roberts commit several traffic violations when he crossed North Main Street." *Id.*, ¶ 15.

{¶ 39} This Court further determined as follows:

> "Authority to conduct a patdown search for weapons does not automatically flow from a lawful stop[.]" *State v. Stewart,* Montgomery No. 19961, 2005-Ohio-1319, ¶ 16. Once a lawful stop has been made, the

police may conduct a limited protective search for concealed weapons if the officer reasonably believes that the suspect may be armed or a danger to the officer or to others. *State v. Evans* (1993), 67 Ohio St.3d 405, 408, 618 N.E.2d 162; *State v. Molette*, Montgomery App. No. 19694, 2003-Ohio-5965, ¶ 13. "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Evans*, 67 Ohio St.3d at 408, 618 N.E.2d 162, quoting *Adams v. Williams* (1972), 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612.

To justify a patdown search, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. However, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27; *State v. Smith* (1978), 56 Ohio St.2d 405, 407, 384 N.E.2d 280. The totality of the circumstances must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews* (1991), 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271, citing *State v. Freeman* (1980), 64 Ohio St.2d 291, 295, 414 N.E.2d 1044.

We emphasize that an officer must have a reasonable *individualized* suspicion that the suspect is armed and dangerous before he may conduct

a patdown for weapons. See *Terry*, supra; *Ybarra v. Illinois* (1979), 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238; *Maryland v. Buie* (1990), 494 U.S. 325, 334, fn. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted.") Mere presence in a high crime area or high drug area, by itself, is insufficient to justify the stop and frisk of an individual. See *State v. Carter* (1994), 69 Ohio St.3d 57, 65, 630 N.E.2d 355 ("Although the investigative stop took place in a high crime area, that factor alone is not sufficient to justify an investigative stop."); *Brown v. Texas* (1979), 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (being "in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct"). "To hold otherwise would result in the wholesale loss of the personal liberty of those with the misfortune of living in high crime areas." *Carter*, 69 Ohio St.3d at 65, 630 N.E.2d 355.

In this case, there is no evidence that Fuller's patdown of Roberts was based on a reasonable and articulable suspicion that Roberts may have been armed. Fuller explained the bases for the frisk, stating: "I did this because this is both a high crime and high drug area. I personally have made drug arrests, gun arrests, and have personal knowledge of other officers making gun and drug arrests within the same vicinity. We have an officer involved shooting within two blocks of there several weeks before

that. Based on these reasons, I patted him down for weapons." As for Roberts specifically, Fuller stated that, prior to the search, Roberts was compliant, made no assertive movements, did not reach into his pockets, was not belligerent or verbally abusive, and had not discarded anything. Fuller did not know Roberts, and his stop of Roberts was based on a traffic violation, not any suspicion of drug activity or any other criminal conduct that might involve weapons. Fuller acknowledged on cross-examination that, "at this point, [Roberts] was 100% compliant. He didn't do anything to make [the officer] worry that he was going to do anything to harm [him]."

Based on Fuller's testimony, it is apparent that the officer lacked the requisite patdown for weapons. Accordingly, the trial court erred in denying Roberts' motion to suppress evidence obtained as a result of the patdown, i.e., the handgun.

*Id.*, ¶ 16-20.

**{¶ 40}** Roberts next argued that "all 'fruits' of Fuller's search should be suppressed as 'fruit of the poisonous tree,' " such that "the assault charge should be precluded by the officer's unlawful patdown for weapons." *Id.*, ¶ 21. This Court noted as follows:

We have held that "where the officers lacked cause to effectuate an original arrest yet where the accused responded to an illegal arrest by physically attacking the officer, the evidence of this new independent crime is admissible." *State v. Stargell,* Montgomery App. No. 20631, 2005-Ohio-312, ¶ 19, citing *State v. Jobes*, Montgomery App. No. 20210, 2004-Ohio-

1167; *State v. Nelson* (Mar. 9, 2001), Champaign App. No. 00CA12; *State v. Barnes* (Dec. 5, 1997), Montgomery App. No. 16434. "In such cases, no exploitation of the prior illegality by police is involved." *Jobes* at ¶ 15, quoting *Nelson*, supra.

*Id.*, ¶ 22.

**{¶ 41}** This Court concluded that while "Fuller lacked a reasonable articulable suspicion to search Roberts for weapons, thus making the seizure of the handgun unlawful, the officers were nonetheless permitted to arrest Roberts for his assault on a police officer." *Id.*, ¶ 26. This Court concluded that "the exclusionary rule does not apply to bar evidence of Roberts' assault on Fuller." *Id.*

**{¶ 42}** We initially note that we agree with the trial court that the stop of Ewing was valid. Reeb testified that Ewing improperly utilized the vehicular portion of the roadway by crossing More Avenue in a diagonal manner without crossing at the intersection, and the officers were entitled to stop Ewing to investigate this perceived violation. The fact that the jaywalking citation was dismissed, and that Ewing may have had a defense to the section of the RCGO he was cited under is immaterial to the stop's validity.

**{¶ 43}** Regarding the State's assertion in its brief, however, that "under the totality of the circumstances, the officers had reasonable suspicion that Ewing was involved in drug-trafficking and, accordingly, was armed and dangerous," as well as the State's assertion in its reply brief that Ewing "was lawfully stopped as part of a valid *Terry* stop based on reasonable suspicion of drug activity even if he did not commit a jaywalking violation," we disagree. "Reasonable suspicion has been defined as something that is

more than an inchoate hunch or unparticularized suspicion or hunch, but is less than the level of suspicion required for probable cause." *State v. Mackey*, 141 Ohio App.3d 604, 752 N.E.2d 350 (2d Dist. 2001).

{¶ 44} Reeb testified that he intended solely "to make a stop on [Ewing] for jaywalking across More Avenue." R.C. 2935.26 provides that a citation for a minor misdemeanor must be used rather than an arrest, in the absence of certain exceptions, and there was no evidence in the record that the listed exceptions in R.C. 2935.26 apply. For example, one of the exceptions to issuing a citation is that the "offender cannot or will not offer satisfactory evidence of his identity." R.C. 2935.26(A)(2). While Reeb initially asked for Ewing's identification, as the trial court determined, Ewing "was not given an opportunity to identify himself," since Reeb then indicated that he intended to pat Ewing down before allowing him to reach into his pocket to retrieve his identification.

{¶ 45} Further, while Ewing exited 28 More Avenue after a very brief time inside, neither the source nor the reliability of the complaint that drug activity was occurring there are part of the record. While Reeb, who was not alone but was accompanied by Conrads, testified that he patted Ewing down due to where Ewing "came from," due to the general area's association with drug activity and prostitution, and due to the fact that drugs and weapons are often found together, Reeb further testified that Ewing did not engage in any furtive movements, such as reaching into his clothing, as in *Wilks*, and that he did not observe any bulges about Ewing's person that might be suggestive of weapons. There was no suggestion that Ewing observed the officers as he exited 28 More Avenue and attempted to evade their detection, as in *Barton*; Reeb testified that he "was able to get directly behind [Ewing] before he even recognized us." Further, there was no suggestion

that Ewing was known to the officers based upon a prior criminal history. Regarding the State's focus on the fact that Ewing twice backed away from Reeb, we note that in *Sumlin,* 2009-Ohio-2185, ¶ 50, upon which Ewing relies, this Court found "that the action of simply backing away, slowly, over a short distance, from two police officers exiting a police cruiser, in a high crime neighborhood, with ones hands behind ones back, is not sufficient to give rise to a reasonable, articulable suspicion that criminal activity is afoot, as required for a stop under *Terry v. Ohio* * * *." Further, we conclude that Ewing's movement presented no appreciable prospect of danger to the officers. Reeb testified that Ewing did not have the opportunity to flee, like the defendants in *Williams* and *Lewis,* before he was seized and taken to the ground. Reeb testified that Ewing was arrested specifically for the contraband found on his person. Under the totality of the circumstances, we conclude that Reeb lacked an *individualized* suspicion, specific to Ewing, which suggested a threat to the officers' safety.

**{¶ 46}** Having found, as did the trial court, that Reeb and Conrads lacked a reasonable, articulable suspicion that Ewing may have been armed, we conclude that the State's assigned error lacks merit. In other words, the trial court did not err in granting Ewing's motion to suppress. Accordingly, the State's assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Michael J. Scarpelli
Adelina E. Hamilton
Hon. Timothy N. O'Connell